# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Daniel Lopez,

                    Plaintiff,

          v.

Construction and Building
Materials, Drivers, Helpers
and Inside Employees Union,
Teamsters Local #221, and
George Vojta, individually,

                    Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 04-1028 ADM/AJB

_____

Leslie L. Lienemann, Esq. and Celeste E. Culberth, Esq., Culberth & Lienemann, LLP, St. Paul,
MN, on behalf of Plaintiff.

Martin J. Costello, Esq. and Katrina E. Joseph, Esq., Hughes & Costello, St. Paul, MN, on behalf
of Defendants.

_____

## I. INTRODUCTION

On November 3, 2005, oral argument before the undersigned United States District Judge

was heard on Defendants Construction and Building Materials, Drivers, Helpers and Inside

Employees Union, Teamsters Local #221 ("Local 221") and George Vojta's (individually

"Vojta," collectively "Defendants") Amended Motion for Summary Judgment [Docket No. 52].

In his Amended Complaint [Docket No. 10], Plaintiff Daniel Lopez ("Lopez") alleges that

Defendants denied him equal employment opportunities, and committed national origin

discrimination and reprisal, in violation of 42 U.S.C. § 1981 and the Minnesota Human Rights

Act ("MHRA"), Minn. Stat. § 363A.01 *et seq*.  Because Plaintiff has established a trialworthy

issue of pretext, Defendants' Motion is denied.

## II. BACKGROUND[1]

### A.    Vojta's Career with Local 221

Vojta is a sixty-one year old white male of Bohemian, German, and Scottish descent.

Vojta Dep. Vol. I [Docket No. 59] (Lienemann Decl. [Docket No. 58] Ex. 7) at 8; Vojta Dep.

Vol. II [Docket No. 59] (Lienemann Decl. Ex. 8) at 242.   Vojta was employed by Local 221 as a

business agent, an appointed position, from 1984 to 2004.   Vojta Dep. Vol. I at 15-16.   During

that same time period, Vojta also held elected offices within Local 221, as a union steward,

trustee, recording secretary, vice president, president, and secretary-treasurer.   Id. at 16.   Vojta

held the secretary-treasurer position, the highest elected office within Local 221, from 1998 to

2004.[2]  Id. at 17.   In June 2004, Local 221 merged into Local 120 and as a result, Local 221 no

longer exists.   Id. at 6, 8.   Vojta was then employed by Local 120 as a business representative

and served on the executive committee as a trustee.   Id.   He retired on December 30, 2004.   Id.

### B.    Lopez's Career with Local 221

Lopez is a fifty-two year old Hispanic male of Spanish, Irish, and German descent.

Lopez Dep. Vol. I [Docket No. 58] (Lienemann Decl. Ex. 1) at 21, 23.   Lopez was employed by

A.B.C. Millwork from 1978 to 1995 as a millworker, and was a member of Local 221.   Id. at 45-

46, 49-50.   Lopez was next employed by Local 221 as a business agent from May 1, 1995 to

---

[1] Both Plaintiff and Defendants filed a multitude of exhibits and deposition transcripts. While not all facts are included in this Order, care was taken to include the most relevant facts, especially the facts favorable to Plaintiff as the non-movant.

[2] Pursuant to the bylaws, the secretary-treasurer is the principal executive officer of Local 221.   The president is second-in-command.   Katrina Aff. [Docket No. 36] Ex. 1 [Docket No. 17] §§ 7, 8(A).   Although it seems counterintuitive that secretary-treasurer and not president is the "highest" office, it apparently is the reality in some labor unions.

November 13, 2001.  Id. at 46, 89.  Lopez also held elected offices within Local 221 throughout

his career: union steward from approximately 1979 to 1988, trustee from approximately 1988 to

1997, recording secretary from approximately 1997 to 1998, and president from approximately

1998 to 2001.  Id. at 50, 59, 63, 80; Katrina Aff. Exs. 4B, C, D, E [Docket No. 17].

**C.     Local 221 Election Process**

        Local 221 was an affiliate of Minnesota Teamster Joint Council #32 ("Joint Council 32"),

the umbrella organization for all of the Teamster local unions in Minnesota, which in turn is an

affiliate of the International Brotherhood of Teamsters ("IBT").  Vojta Dep. Vol. II at 222;

Katrina Aff. Exs. 1 § 14(A)(15), 2 [Docket No. 17] Art. IV.  Union members tended to become

officers of Local 221 according to a common pattern.  Id. at 221.  First, an officer position on the

executive board became available through the death, retirement, or resignation of an officer.  Id.

at 212.  Next, the current executive board looked for a member that had been active in the union,

typically by sitting on a grievance board or negotiation committee, or acting as a union steward,

to fill the vacant executive board position.  Id. at 211; Kuechle Aff. [Docket No. 29] ¶ 8.  If one

of the higher elected offices became vacant, such as secretary-treasurer or president, typically all

of the current executive board members advanced by appointment to the next highest position on

the executive board, and the newest executive board member was appointed to one of the three

trustee positions.  See Gaither Dep. [Docket No. 59] (Lienemann Decl. Ex. 4) at 27-30.

Elections were held once every three years, and so the incumbent officers stood for election or

re-election at that time.  Katrina Aff. Ex. 1 § 17(a).

        Another election pattern involved the creation of a "slate," in which all of the incumbent

officers banded together to form one group of candidates running together for their respective

offices.  Vojta Dep. Vol. II at 275-76.  The slate created an "all for one, one for all" mentality in which the slate members campaigned for one another and dissuaded other potential candidates from running for office.  Kuechle Aff. ¶ 17.  Also, if the members of the slate were unopposed, then the need for a ballot vote was obviated and the slate members were instead elected by acclamation.  Vojta Dep. Vol. II at 278.  If slate members were opposed, then a ballot vote was held for those particular contested offices, but slate members tended to have an enormous political advantage and usually won the election.  Id. at 277-78.

In addition, the principal officer tended to select one individual to mentor and groom with the goal of training that individual to one day become secretary-treasurer.  Bailey Aff. [Docket No. 28] ¶ 19.  Paul Bailey mentored and groomed Vojta, and Vojta in turn mentored and groomed Lopez.  Id. at ¶¶ 20, 26; Vojta Dep. Vol. II at 231-32.  Vojta made it known that he intended for Lopez to one day take over as secretary-treasurer of Local 221.  Vojta regularly stated that some day, he and Lopez would run the Local together, and stated that Lopez was "the heir apparent . . . my protégé."  Vojta Dep. Vol. I at 36; Lopez Dep. Vol. II [Docket No. 58] (Lienemann Decl. Ex. 2) at 81-82; Gaither Dep. at 39, 43-44, 84.

## D.    Derogatory and Racist Remarks at Local 221

During the same time period that Vojta mentored Lopez, Vojta occasionally called Lopez derogatory names behind his back.  Vojta Dep. Vol. II at 245-50.  According to Vojta, he occasionally called Lopez a "fucking Mexican" out of frustration, when Vojta perceived that Lopez wasn't following orders or had "screwed up."[3]  Id. at 243-47.  Vojta characterizes such

---

[3] While John Gaither, Paul McDaniel, and Larry Baer remember hearing Vojta occasionally refer to Lopez as "the little fucking Mexican," or some variation of those words, Charles "Rollie" Jones, David Soukup, Dave Schrunk, and others maintain that they never heard

language as "a fault of mine," and maintains that he never made such comments to Lopez's face. Id. at 244-45. Lopez could not have continued to move forward to higher elected offices on Local 221's executive board without Vojta's support. Id. at 248-50. Beyond dispute of the parties, swearing was commonplace in daily conversations at Local 221, as was giving members and officers nicknames based on their appearances or personal characteristics.[4] Vojta Dep. Vol. I at 139-41; Gaither Dep. at 95-100; Kuechle Aff. ¶¶ 13-14; McMahon Aff. [Docket No.30] ¶ 17.

Lopez alleges that he observed discriminatory words and acts among both Local 221's members and officers while he served as president, and that he occasionally heard Vojta make derogatory comments about female and minority union members. For example, in 1998, in response to an incident involving a black driver named Andrae Boyle, Vojta allegedly said to Lopez "[d]on't keep pissing everyone off at the Main Plant anymore by saving those worthless black drivers." Katrina Aff. Ex. 32 [Docket No. 21] at 1. In response to an incident in 2000 involving black drivers Anthony Few and Howard Scoggins, Vojta allegedly stated that "[h]e was tired of getting all the God Damned calls from the white drivers telling him I [Lopez] am helping those God Damn black drivers again." Id. at 4. In response to a sexual harassment charge in 2000 by female drivers Cheryl Galewski and Judith Landry, Vojta allegedly told Lopez

---

Vojta make such remarks. Gaither Dep. 89-91; McDaniel Dep. [Docket No. 59] (Lienemann Decl. Ex. 6) at 13-15; Baer Dep. [Docket No. 58] (Lienemann Decl. Ex. 3) at 36; Jones Dep. [Docket No. 59] (Lienemann Decl. Ex. 5) at 96-97; Schrunk Aff. [Docket No. 33] ¶ 24; Soukup Aff. [Docket No. 34] ¶ 6.

[4] While working at A.B.C. Millwork, Lopez publicly self-identified himself as "Pepe" in the following ways: by sometimes signing work orders as "Pepe," writing "Pepe 89" on a wooden crate, and writing "Pepe is cool" on the walls. Nesgoda Aff. [Docket No. 31] ¶ 8; Katrina Aff. Exs. 45a, b, and c [Docket No. 26].

"that boys will be boys, and that the female drivers overreacted."  Id. at 7.[5]

Vojta denies making derogatory statements about women and minorities, although he admits that at times, if Lopez was pursuing a grievance that Vojta believed had no merit, Vojta would make comments such as "[j]ust because he's fucking black, that doesn't make him right." Vojta Dep. Vol. I at 140-41; Vojta Dep. Vol. II at 262-63.  Vojta also stated that although Lopez did a good job representing everyone, he became concerned as a result of complaints and phone calls from members that Lopez was spending too much time on minority grievances and not representing the white members equally.[6]  Vojta Dep. Vol. I at 47-48, 135-36.

Lopez made statements about discrimination at an October 2, 2001 general membership meeting, in response to racial incidents that were occurring at one of Local 221's companies. Jones Dep. at 20-21.  The meeting minutes reflect the substance of Lopez's comments:

> Being of a somewhat diverse background I can relate and help settle problems in the workplace in a more straight forward manner, but I get frustrated with what prejudice our members create for each other while at work.  In addition, due to the September 11, 2001 attacks in New York and Washington, DC, religious beliefs, skin color, and national heritage play even a bigger [role] in negative and discriminatory behavior by our members upon each other."

---

[5] Exhibit 32 is an eight page document created by Lopez entitled "Harassment by Teamster Local Union 221 Officers in the Fair Representation of Minorities and Women Members" ("Harassment document").  The document describes various interactions between Lopez and Vojta from 1998 to 2001 in which Vojta allegedly made racist and sexist remarks about union members.  In his deposition, Lopez testified that he would take notes in his daily planner and in a notebook about events that occurred, and later used those notes to create the Harassment document.  Lopez Dep. Vol. II at 40-42.

[6] A statistical review of grievance and complaint files revealed that while Lopez was employed as a business agent, he filed approximately 146 grievances or complaints on behalf of 246 members.  Of those, 109 grievances or complaints were filed on behalf of 211 white male drivers and 18 grievances or complaints on behalf of 19 black male drivers.  Lopez Decl. [Docket No. 57].

Katrina Aff. Ex. 5A [Docket No. 17].  Charles "Rollie" Jones ("Jones"), Local 221's recording

secretary during the time period that Lopez was president, testified that "Danny [Lopez] had a

passion for working on discrimination cases and stuff like that.  It was pretty much common

knowledge.  I even used to tell people that.  If you got a discrimination case, get Danny to work

on it because he likes to work on them."  Jones Dep. at 21-22.

**E.      Local 221's 2001 Elections and Lopez's Termination**

        In late September or early October 2001, the incumbent officers of Local 221 agreed to

form the George Vojta Unity Slate for the November election.  Vojta Dep. Vol. II at 282.  Lopez

was the candidate for president and Vojta was the candidate for secretary-treasurer.  Id. at 283.

The slate members agreed to campaign for one another and not to support anybody not on the

slate.  Id. at 285.  Subsequently, John Gaither ("Gaither") was nominated to run against

incumbent Dennis Kuechle ("Kuechle") for vice president.  Id. at 296.  Several days after the

nomination meeting, Vojta allegedly overheard a phone call in which Lopez told Gaither, "when

you beat Dennis, you go into George's office and you demand that he hires you as a business

agent and I will back you fully."  Id. at 301.  Vojta maintains that Lopez's alleged statement to

Gaither was a clear violation of the slate agreement.[7]  Id.  Lopez, on the other hand, states that

while he did suggest to Gaither that Gaither run for trustee, he did so only to keep Gaither from

running for secretary-treasurer or president.  Lopez Dep. Vol. II at 60-70.  Also, after Gaither

was nominated for vice president, Lopez allegedly told Gaither that he would not support

_____

        [7] In addition, Defendants argue that if Gaither had won the election, Lopez would have
effectively gained control of the executive board.  Vojta Dep. Vol. I at 84.  Prior to the election,
three board members tended to vote with Vojta and two board members tended to vote with
Lopez.  If Gaither had won, the number of board members voting with Vojta as opposed to
Lopez would have switched.  Id.

Gaither in Gaither's run for office, but if Gaither were to win, Gaither should talk to Vojta about becoming a business agent.[8]  Id.; see Gaither Dep. at 79.

Vojta, allegedly as a result of Lopez's support for a non-slate candidate, made the "agonizing" decision to terminate Lopez from his business agent position.  Vojta Dep. Vol. I at 79, 93; Vojta Dep. Vol. II at 309.  Under Local 221's Bylaws, the secretary-treasurer had the authority to hire and fire business agents with the approval of the executive board.  Katrina Aff. Ex. 1 §§ 8(A), 13(A).  On November 13, 2001, Vojta called Lopez into his office, and with Business Agent Dave Schrunk present, terminated Lopez from his business agent position. Lopez Dep. Vol. I at 139.  According to Lopez, Vojta said "[t]his has nothing to do with the election, but we don't know whose side you are [on].  You can't be trusted.  There's been complaints about you . . . no one wants to work with you."  Id. at 142-43.  At Lopez's request, Vojta agreed not to fire Lopez on the spot and instead placed him on suspension.  Id. at 149. Vojta called a special emergency board meeting that evening to vote on Lopez's termination, and excluded Lopez from the meeting, even though Lopez had a right to attend the meeting as president of Local 221.  Id. at 149-50; Vojta Dep. Vol. I at 122.

At the meeting, Vojta presented his case to the other officers, and the board voted five to one to terminate Lopez.[9]  Katrina Aff. Ex. 4E [Docket No. 17]; Vojta Dep. Vol. I at 124; Lopez

_____

[8] Gaither maintains that while Lopez did try to talk him out of running for secretary-treasurer, Lopez eventually agreed with him that he should run for vice president.  Gaither Dep. at 73.  Gaither asserts that Lopez said "that he would not bad mouth me, and he would not campaign for me, but if anybody asked him what he thought—a direct question what he thought about me as a person, he would answer them honestly."  Id. at 74.

[9] Trustee Steve Parks was hired to replace Lopez as business agent.  Vojta Dep. Vol. I at 79.

Dep. Vol. I at 156.  Jones recalls Vojta saying that he wanted to fire Lopez for insubordination, an unsigned check, and because Lopez was tough to work with, but Jones felt Vojta's allegations were "trumped up" because the termination was "more political than job related."  Jones Dep. at 37-38.  Trustee Paul McDaniel ("McDaniel") remembers Vojta stating that one of the reasons he was firing Lopez was because of complaints from white drivers that Lopez was spending too much time representing the black drivers.  McDaniel Dep. at 17.  McDaniel also thought the firing was politically motivated.  Id. at 60-61.  The remaining officers recall Vojta stating that he wanted to fire Lopez for political disloyalty, challenging and undermining Vojta's authority, and countermanding Vojta's orders.  Kuechle Aff. ¶ 26; Parks Aff. [Docket No. 32] ¶ 18; Soukup Aff. ¶ 21.

On November 15, 2001, when Lopez wrote to Vojta to ask for his job back, Lopez emphasized the bond they had with one another, stated that he had not conspired against Vojta or tried to embarrass Vojta in front of others, and acknowledged that Vojta was in charge of the Local and had the final say in matters.  Katrina Aff. Ex. 29 [Docket No. 20].  Lopez's letter brought no change.  On November 20, 2001, Lopez convened an executive board meeting to discuss his termination with the other officers and conduct a re-vote.  Lopez Dep. Vol. I at 159; Katrina Aff. Ex. 4F [Docket No. 17].  At the meeting, Lopez and Vojta discussed Vojta's various reasons for terminating Lopez, and each individual had a chance to present his side.  Lopez stated that he had not done anything wrong, he and Vojta worked well together, and he wanted his job back.  Lopez Dep. Vol. I at 162-63; Ex. 4F.  Lopez asked for a re-vote on his termination, but Brad Slawson, IBT's representative to Local 221, prevented a re-vote and stated that Lopez's only recourse was through Joint Council 32 or the IBT.  Lopez Dep. Vol. I at 166-70; Ex. 4F.

**F.      Lopez's Appeal of his Termination**

After Lopez's termination as a business agent, an appeals process to Joint Council 32 and

the IBT ensued.  At various times during the termination/appeals process, Vojta advanced the

following reasons for terminating Lopez: 1) Lopez voided a check that Vojta had signed for one

of the trustees, 2) Lopez threatened the secretaries not to use an unused plane ticket to Las Vegas

purchased by the Local and offered to the secretaries by Vojta, 3) Lopez counseled Gaither to

run against the slate, 4) Lopez rolled his eyes at meetings, 5) Lopez screamed at members and

flew off the handle, 6) Lopez's removal was necessary to provide the best representation to

union members, 7) Lopez undermined Vojta's authority as principal officer of the Local, 8)

Lopez did not work in harmony with the full time staff, 9) Vojta had lost confidence in Lopez's

ability to represent members in a fair and impartial manner, 10) Lopez refused to go out of town

on business trips, and 11) Lopez interrupted Vojta at meetings in front of the membership.[10]

Vojta Dep. Vol. I at 80-144, Exs. 4F, 11 [Docket No. 17], 17D [Docket No. 18].  When asked at

his deposition to list all the reasons why he fired Lopez, Vojta stated "[t]he main reason was

political, in my opinion, political, insubordination, countermanding my orders, basically

portraying me to the members as just a figurehead, all those—all those together."  Vojta Dep.

Vol. I at 95.

In his appeal letter to Joint Council 32, Lopez wrote "I sincerely believe [my termination]

has no merit as to my conduct and how I perform my job for our members.  In addition, I believe

_____

[10] Vojta asserted one or a combination of these reasons for terminating Lopez to different
people at different times in the termination/appeals process and in this litigation.  At his
deposition, Vojta continued to emphasize that "[i]t was strictly political in . . . my view that led
to the termination."  Vojta Dep. Vol. I at 122.

it is also politically motivated due to our current Local Union election."[11]  Katrina Aff. Ex. 17A

[Docket No. 24].  Joint Council 32 reviewed Lopez's request for a hearing and the at-will nature

of Lopez's employment, and determined that no hearing was necessary because Lopez had been

terminated in accordance with the bylaws.  Katrina Aff. Ex. 17E [Docket No. 18].  In his appeal

to the IBT, Lopez again stated that he believed his termination was politically motivated.

Katrina Aff. Ex. 19A [Docket No. 25].  On appeal, the IBT affirmed Joint Council 32's decision

after concluding that Local 221 was not required to give Lopez a hearing before terminating his

employment because Lopez was an at-will employee.  Exs. 19B, E.  Lopez did not file

discrimination charges against the Local or assert discrimination as a reason for his termination

at any time during the termination/appeals process.  Lopez Dep. Vol. I at 279.  After his appeals

were unsuccessful, Lopez "reluctantly" resigned his presidency on January 14, 2002.  Id. at 91;

Katrina Aff. Ex. 21 [Docket No. 20].

### III. DISCUSSION

**A.     Standard**

     Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion

---

[11] In his deposition, Lopez stated that for a time, he believed just cause was required for
Vojta to terminate him from his business agent position.  Lopez Dep. Vol. I at 163.

for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).  "Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim."  Whitley v. Peer Review Sys., Inc., 221 F.3d 1053, 1055 (8th Cir. 2000) (citations omitted).

**B.    Exhaustion**

Defendants argue that all of Lopez's claims must be dismissed because Lopez failed to first pursue his discrimination claims through the internal union appeal process, as required by the IBT Constitution.  See Katrina Aff. Ex. 3 [Docket No. 17] at 150; see also Ex. 1 at 41-45. Defendants maintain that Lopez was mandated to first use the internal union dispute process because his claims require the interpretation of provisions of the IBT Constitution and Local 221 Bylaws and therefore constitute an "internal dispute."  Plaintiff argued at oral argument against exhaustion of administrative remedies and preemption by alleging that his state law claims do not require interpretation of any provision of the union constitution or bylaws and are based purely on rights created by the MHRA.

The Supreme Court has held that courts have discretion to decide whether to require exhaustion of internal union procedures.  Clayton v. Int'l Union, UAW, 451 U.S. 679, 689 (1981).

In exercising this discretion, at least three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on

12

his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim.

Id. at 689; see also Seniority Research Group v. Chrysler Motor Corp., 976 F.2d 1185, 1188 (8th Cir. 1992); Stafford v. Ford Motor Co., 790 F.2d 702, 705 (8th Cir. 1986).  When internal union procedures are not capable of affording the employee the complete relief he seeks, "national labor policy would not be served by requiring exhaustion of internal remedies."  Clayton, 451 U.S. at 693.  Also, the policy of forestalling judicial interference with union affairs applies only to "disputes arising over internal union matters such as those involving the interpretation and application of a union constitution" and not disputes that are "'in the public domain and beyond the internal affairs of the union.'"  Id. at 688.

This case is not one in which the employee of a company is suing both his company for a breach of the collective bargaining agreement ("CBA") and his union for a breach of the duty of fair representation under § 301 of the Labor Management Relations Act ("LMRA").  Instead, this case involves an employee suing an employer—that happens to be a union—for alleged racial discrimination under the MHRA and 42 U.S.C. § 1981.  Lopez's claims do not require the application and interpretation of the Local 221 Bylaws or IBT Constitution, and as a result, his state law claims are not preempted by § 301.  His claims of discrimination "are beyond the internal affairs of the union" and therefore do not give rise to a requirement to first exhaust internal union procedures.  See id.

In addition, the factors behind the exhaustion principle are instructive.  In his Amended Complaint, Lopez has requested seven separate components of relief, including: damages for lost pay and benefits, damages for emotional anguish, punitive damages, treble damages, a civil

13

penalty to the state, and attorney's fees and costs.  Am. Compl.  Whether Lopez is entitled to any

of the relief requested remains a serious issue, but it is clear that the union is unable to provide

complete relief if liability is found.  While the union does have the power to impose "decisions

and penalties" including "reprimands, fines, suspensions, expulsions, revocations, denial to hold

any office permanently or for a fixed period, or commands to do or perform, or refrain from

doing, or performing, specified acts," the union could not provide relief such as the payment of a

civil penalty to the state pursuant to Minnesota state law.  See Katrina Aff. Ex. 3 at 146-47.

Requiring exhaustion "would be a useless gesture: it would delay judicial consideration of

[Plaintiff's] action, but would not eliminate it."  Clayton, 451 U.S. at 693.  Therefore, Lopez was

not required to exhaust his discrimination claims through the internal union process before filing

this suit.

**C.       Preemption**

Defendants next argue that Lopez's state law claims are preempted under § 301 of the

LMRA because they require interpretation of the union constitution and bylaws.[12]  See 29 U.S.C.

§ 185.  As a union member and officer, Lopez was bound by Local 221's Bylaws and the IBT

Constitution, which create duties and responsibilities for union officers, including requiring

officers to advance the goals of the elected administration.  Defendants argue that Lopez was

terminated because he demonstrated that he was no longer willing to advance the

administration's goals.

Plaintiff responds that his state law claims are not preempted because they do not require

_____

[12] Plaintiff concedes that his MHRA claims were pled only against Local 221 and not
against Vojta.

14

interpretation of any provision of the union constitution or bylaws and are based purely on rights

created by the MHRA.  In addition, Defendants' argument requires the Court to impermissibly

accept Defendants' version of a disputed fact, namely, that Plaintiff was terminated for no longer

intending to advance the goals of the elected administration.

    Section 301 of the LMRA states:

> Suits for violation of contracts between an employer and a labor organization
> representing employees in an industry affecting commerce as defined in this chapter, or
> between any such labor organizations, may be brought in any district court of the United
> States having jurisdiction of the parties, without respect to the amount in controversy or
> without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  The Supreme Court has held with respect to § 301 that "if the resolution of a

state-law claim depends upon the meaning of a collective-bargaining agreement, the application

of state law . . . is pre-empted and federal labor-law principles . . . must be employed to resolve

the dispute." Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-06 (1988) (stating the

rule developed and applied in Teamsters v. Lucas Flour Co., 369 U.S. 95 (1962) and Allis-

Chalmers Corp. v. Lueck, 471 U.S. 202 (1985)).  The Supreme Court has further held that if a

state law claim does not require interpretation of any provision of a collective bargaining

agreement and instead contains purely factual questions, the state law claim is "independent" and

not preempted by § 301.  Id. at 407.

The Eighth Circuit has articulated the Supreme Court's § 301 preemption test as follows:

"§ 301 preempts a claim if the claim is 'founded directly on rights created by the CBA' or if a

resolution of the claim is 'substantially dependent on analysis of the CBA.'" Graham v.

Contract Transp., Inc., 220 F.3d 910, 913 (8th Cir. 2000) (noting conflicting precedents within

the Eighth Circuit and determining that the narrower approach to preemption is more faithful to

Supreme Court precedent).  In addition, the Eighth Circuit has extended § 301 preemption to

state law claims that are based upon local and international union constitutions.  DeSantiago v.

Laborers Int'l Union of N. Am., Local No. 1140, 914 F.2d 125, 128 (8th Cir. 1990).  However,

the Eighth Circuit has "[made] it clear that a claim is not preempted simply because it relates to a

dispute in the workplace."  Graham, 220 F.3d at 913; c.f. Thomas v. Union Pac. R.R. Co., 308

F.3d 891, 893 (8th Cir. 2002) ("Mere reference to a collective bargaining agreement is not

sufficient to result in preemption.").

In this case, Plaintiff's state law claims are founded directly on rights created by the

MHRA rather than rights created by the union constitution or bylaws.  See Lingle, 486 U.S. at

412-13 ("[T]he mere fact that a broad contractual protection against discriminatory—or

retaliatory [sic] discharge may provide a remedy for conduct that coincidentally violates state-

law [sic] does not make the existence or the contours of the state law violation dependent upon

the terms of the private contract."); Brown v. Holiday Stationstores, Inc., 723 F. Supp. 396, 405-

07 (D. Minn. 1989).  In addition, while Plaintiff's state law claims may require reference to the

union constitution or bylaws, the claims are not "substantially dependent" on an analysis of the

union constitution or bylaws because Plaintiff's state law claims do not require interpretation of

any particular provision of either the union constitution or bylaws.  Instead, Plaintiff's state law

claims depend primarily on the resolution of factual questions.  Therefore, Plaintiff's state law

claims are "independent" and not preempted by § 301.

**D.	Discrimination under 42 U.S.C. § 1981 and the MHRA**

42 U.S.C. § 1981(a)  provides: "All persons within the jurisdiction of the United States

shall have the same right in every State and Territory to make and enforce contracts, to sue, be

16

parties, give evidence, and to the full and equal benefit of all laws and proceedings for the

security of persons and property as is enjoyed by white citizens . . . ."  The MHRA provides in

relevant part:

> Except when based on a bona fide occupational qualification, it is an unfair employment
> practice for an employer, because of race, color, creed, religion, national origin, sex,
> marital status, status with regard to public assistance, membership or activity in a local
> commission, disability, sexual orientation, or age to: (b) discharge an employee.

Minn. Stat. § 363A.08, subd. 2(b).[13]  The MHRA also prohibits an employer from engaging in

reprisal against an employee because the employee "(1) [o]pposed a practice forbidden under

this chapter or . . . (2) [a]ssociated with a person or group of persons who are . . . of different

race, color, creed, religion, sexual orientation, or national origin."  Minn. Stat. § 363A.15.

Plaintiff's discrimination and retaliation claims under § 1981 and the MHRA are all

analyzed with respect to the McDonnell Douglas burden shifting framework.[14]  See Clearwater v.

I.S.D #166, 231 F.3d 1122, 1124 n.2 (8th Cir. 2001); Barge v. Anheuser-Busch, Inc., 87 F.3d

256, 258-59 (8th Cir. 1996); Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 441 (Minn.

1983).  Under McDonnell Douglas, the Plaintiff first has the burden of establishing a prima facie

case.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  For racial discrimination

claims, Plaintiff must show that 1) he is a member of a protected class, 2) he is qualified for the

position, 3) adverse action was taken against him, and 4) there is some evidence that would

---

[13] Minn. Stat. § 363A.08, subd. 1 of the MHRA deals with unfair discriminatory practices
and labor organizations.  However, subdivision 2 is the applicable subdivision in this case
because Lopez is essentially alleging discrimination with respect to his status as an employee of
Local 221 rather than with respect to his status as a member of a union.

[14] The prima facie case that the Plaintiff must prove in the first prong of the McDonnell
Douglas burden shifting analysis varies slightly between the discrimination and retaliation
claims.

allow the inference of improper motivation.[15]  Landon v. Northwest Airlines, Inc., 72 F.3d 620,

624 (8th Cir. 1995).  For retaliation claims, the Plaintiff must show that 1) he engaged in

statutorily protected activity, 2) he suffered an adverse employment action, and 3) a causal

connection existed between the adverse employment action and the protected activity.  Barge, 87

F.3d at 259; Wiehoff v. GTE Directories Corp., 61 F.3d 588, 598 (8th Cir. 1995).  Second, the

Defendants may rebut the presumption established by Plaintiff's prima facie case by articulating

a legitimate, non-discriminatory reason for the adverse employment action.  Barge, 87 F.3d at

259.  Third, the burden shifts back to the Plaintiff to prove that the Defendants' legitimate

reasons "were not its true reasons, but were a pretext for discrimination."  Burdine, 450 U.S. at

253.  "The ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff remains at all times with the plaintiff."[16]  Id.

### 1.    Prima Facie Case

---

[15] The Eighth Circuit has stated that the fourth element of the discrimination prima facie case may be satisfied by evidence that the employer assigned a non-minority employee to perform the same work or the employer sought people with the same qualifications to fill the job. See, e.g., Legrand v. Trs. of Univ. of Ark. at Pine Bluff, 821 F.2d 478, 480 (8th Cir. 1987); Richmond v. Bd. of Regents of the Univ. of Minn., 957 F.2d 595, 598 (8th Cir. 1992).  However, it is well established that "[t]he proof required to establish a prima facie case of discrimination will necessarily vary in different fact situations.  The operative inquiry is whether the plaintiff has produced sufficient evidence to create an inference—that is, a rebuttable presumption—that an employment-related decision was based on an illegal racial criterion under the Act."  Legrand, 821 F.2d at 480, citing McDonnell Douglas Corp., 411 U.S. at 802 n.13.  Also, "[t]he prima facie burden is not so onerous as, nor should it be conflated with, the ultimate issue of racially-motivated action."  Landon, 72 F.3d at 624; see also Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981).

[16] The McDonnell Douglas analysis is used when there is no direct evidence of discrimination.  Whitley, 221 F.3d at 1055.  Direct evidence is not the converse of circumstantial evidence, but rather "refers to the causal strength of the proof."  Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004).  Plaintiff has not alleged sufficient direct evidence in this case, and therefore, the Court proceeds with the McDonnell Douglas analysis.

Defendants concede that Plaintiff can satisfy the first and third elements of the prima facie case: Plaintiff is a member of a protected class because he is Hispanic, and Plaintiff suffered an adverse employment action when he was terminated.  Defendants, however, argue that Lopez can not establish a prima facie case of discriminatory discharge because he can not prove the second and fourth elements of the <u>McDonnell Douglas</u> test.  Defendants first argue that Lopez's "anti-slate activities" demonstrate that he was not qualified for his job.  Plaintiff responds the prima facie case is met where he satisfies the minimum objective qualifications for the job, which he does.

The Eighth Circuit has held that "[f]or purposes of establishing a prima facie case, the plaintiff[ ] need only show [his] objective qualifications for the job."  <u>Legrand</u>, 821 F.2d at 481.  In addition, in determining whether the Plaintiff is qualified, the Court examines not just Plaintiff's ability to perform, but also whether he "was actually performing [his] job at a level that met [his] employer's legitimate expectations."  <u>Whitley</u>, 221 F.3d at 1055.  In his deposition, Vojta charges Lopez with acting in his own interest rather than in the best interests of the union members by conducting "anti-slate activity."  <u>See</u> Vojta Dep. Vol. II at 321-23.  However, Vojta also concedes "I believe Danny did a very good job repping everybody . . . .  I thought he did a very good job as a business agent.  I thought he repped everybody pretty much equally.  But there was a point and a turnaround where he seemed to be spending more time with the minorities."  Vojta Dep. Vol. I at 135-36.

At this stage of the case, Lopez has made the minimum showing necessary to establish that he was qualified for the job of business agent for purposes of proving a prima facie case of discrimination.  Lopez is college educated and served as both an officer and business agent of

19

Local 221 for many years.  Lopez Dep. Vol. I at 39-40, 50-89.  Lopez rose through the ranks of

Local 221 to higher officer positions and was mentored and trained by Vojta.  Despite

allegations of "anti-slate activity" and "spending too much time with minorities," which are

disputed, Lopez performed his job at a level that met employer expectations, as evidenced by

Vojta's statement that Lopez "did a very good job repping everybody."

Defendants next argue that Lopez can not satisfy the fourth element of the prima facie

case for discrimination because he can not show that members of other racial groups were treated

more favorably.  Not only was Lopez treated the same as similarly situated white business

agents, he was even twice advanced in employment opportunities over an otherwise eligible

white male.  Vojta Dep. Vol. I at 131-32.  Furthermore, it is argued, Vojta's derogatory remarks

were merely "stray remarks," and therefore insufficient to establish the requisite inference of

discriminatory intent.

As noted *infra*, the fourth prong of the prima facie case can be established in different

ways.  While a plaintiff sometimes is able to show that members of other racial groups were

treated more favorably or that his position was filled by a nonmember of the protected class, a

plaintiff need not always do so.[17]  A plaintiff must merely satisfy his "not onerous burden" by

alleging sufficient facts to give rise to an inference of discrimination.  In this case, Plaintiff is

Hispanic, was qualified for his job, and was fired from his job in a setting in which racially

derogatory remarks were made behind his back.  Further, he was accused of spending too much

---

[17] In this case, it has been established that Trustee Steve Parks was hired as business
agent to replace Lopez.  There is no evidence in the record as to Parks' national origin.
However, it is likely that Parks had similar qualifications to Lopez, since Parks was already
serving as one of Local 221's officers, and therefore had already established himself as an
individual with knowledge of the union's inner workings.

time with minorities.  The cumulative effect of this evidence establishes a prima facie case of

discrimination.

### 2.      Legitimate, Non-Discriminatory Reasons

The burden next shifts to Defendants to rebut the presumption established by Plaintiff's

prima facie case by asserting a legitimate, non-discriminatory reason for the termination.  In this

case, Defendants proffer that Plaintiff was terminated primarily for political disloyalty.  The

Supreme Court has stated that at this stage of the analysis, "[t]he defendant need not persuade

the court that it was actually motivated by the proffered reasons."  Burdine, 450 U.S. at 254.

The Court finds that termination of a union employee for political disloyalty is a legitimate, non-

discriminatory reason for discharge.

### 3.      Pretext

Finally, the burden shifts back to Plaintiff to establish that Defendants' legitimate, non-

discriminatory reason for termination, political infidelity, was actually pretext for racial

discrimination.  Defendants argue that Plaintiff can not establish pretext because the racially

disparaging remarks made by Vojta were merely "stray remarks" and were not connected to

Lopez's termination.  Plaintiff responds that Defendants' continually evolving and false reasons

for Lopez's termination create a fact issue as to whether political reasons were a pretext for

racial discrimination.

Stray remarks are "statements by decisionmakers unrelated to the decisional process" and

"'are not sufficient to establish a claim of discrimination.'"  Clearwater, 231 F.3d at 1126

(citations omitted).  Absent a causal link between non-contemporaneous racial comments and the

adverse employment decision, derogatory language is best classified as stray remarks which,

without more, do not create a trialworthy issue of pretext. <u>Simmons v. Océ-USA, Inc.</u>, 174 F.3d

913, 916 (8th Cir. 1999); <u>Reynolds v. Land O'Lakes, Inc.</u>, 112 F.3d 358, 363 (8th Cir. 1997).

In this case, evidence has been presented that Vojta occasionally called Lopez a "fucking

Mexican" or a "fucking little Mexican" behind his back.  There is conflicting evidence as to

whether Vojta made these derogatory comments just a couple of times over the years, or

hundreds of times.  Vojta Dep. Vol. II at 246-62; Baer Dep. at 94.  A witness testified that Vojta

made such comments immediately before Lopez was terminated.  McDaniel Dep. at 13.  Vojta

also referred to black drivers as "worthless blacks," and told Lopez that he was spending too

much time representing minorities.  Katrina Aff. Ex. 32; Vojta Dep. Vol. I at 47-48, 135-36;

McDaniel Dep. at 17-18.  Vojta's derogatory, temporally linked comments toward Lopez

coupled with Vojta's alleged assertion that Lopez was spending too much time representing

black drivers presents a genuine fact issue of pretext.  While there is also strong evidence Vojta

fired Lopez for political reasons, Lopez has presented sufficient evidence giving rise to an

inference of discrimination to overcome Defendants' motion for summary judgment.

**E.      Reprisal under 42 U.S.C. § 1981 and the MHRA**

Claims of reprisal under 42 U.S.C. § 1981 and the MHRA are also analyzed with respect

to the <u>McDonnell Douglas</u> burden shifting test.

**1.      Prima Facie Case**

Defendants argue that Plaintiff can not establish a prima facie case because he was not

engaged in a statutorily protected activity.  Plaintiff's job as a business agent, which required

him to represent all union members equally, was not protected activity.  Plaintiff responds that

Lopez did engage in protected conduct because he associated with African American drivers,

and his advocacy on behalf of minority and women drivers constitutes protected conduct even

though it was part of his job.  See Johnson v. Univ. of Cincinnati, 215 F.3d 561, 575 (6th Cir.

2000).  In response, and due to a lack of case law from Minnesota courts interpreting the

"associational discrimination" provision of the MHRA, Defendants rely on case law from other

circuits interpreting the "associational discrimination" provision of the Americans with

Disabilities Act ("ADA") for the proposition that a plaintiff's advocacy on behalf of a protected

class as a result of his job duties has not in fact been widely recognized as a "substantial" enough

relationship with minorities to qualify as "protected conduct."[18]  See Oliveras-Sifre v. Puerto

Rico Dep't of Health, 214 F.3d 23, 26 (1st Cir. 2000); Freilich v. Bd. of Dirs. of Upper

Chesapeake Health Inc., 313 F.3d 205, 215-16 (4th Cir. 2002).

In Johnson, the court held that a high-level affirmative action official's advocacy on

behalf of women and minorities qualified as protected activity.  215 F.3d at 577.

> Simply because the employer has placed an individual in the position of a high-level affirmative action officer and contracted with the individual to advocate on behalf of women and minorities to insure equality in employment within the institution, does not thereby immunize the employer from being held liable for illegally discriminating against that individual for such advocacy.  To hold otherwise would allow an institution to contract with an individual for the position of a "high level affirmative action official;" put into place an allegedly nondiscriminatory hiring practice . . . circumvent the hiring process against the express advocacy and advice of the affirmative action official; and discriminate or retaliate against the affirmative action official for his advocacy, thus sending a message to the official that he either remain silent or be "punished."

Id.  In contrast, in Oliveras-Sifre and Freilich, the First Circuit and Fourth Circuit, respectively,

denied the plaintiffs' associational discrimination claims under the ADA because the plaintiffs

---

[18] ADA and Age Discrimination in Employment Act ("ADEA") claims are also analyzed with respect to the McDonnell Douglas framework.  Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1044 (8th Cir. 2005); Reynolds, 112 F.3d at 361.

had stated only general references to discrimination for advocacy on behalf of a generalized

group, rather than specific instances of discrimination with regard to a specific individual or

group.[19]  Oliveras-Sifre, 214 F.3d at 26; Freilich, 313 F.3d at 215-16.

    The Court agrees with the Sixth Circuit's view that an individual who advocates on

behalf of a protected group, even if such advocacy is part of the individual's job duties, has

engaged in statutorily protected activity.   There is evidence in this case that Lopez pursued

grievances on behalf of white and black, and male and female union members.   Lopez Decl.

There is evidence that Lopez was known for being the "go-to guy" when it came to members'

discrimination claims, and that Vojta felt Lopez was spending too much time representing

minority and women drivers.   McDaniel Dep. at 17; Jones Dep. at 21-22.   In the weeks before

his termination, Lopez spoke publicly about his advocacy on behalf of minorities.   Katrina Aff.

Ex. 5A.   While these facts may ultimately fail to prove that Lopez was fired in retaliation for his

advocacy on behalf of minorities and women, they are sufficient, when viewed in a context that

includes Vojta's alleged derogatory remarks, to satisfy the first element of the prima facie case,

that Lopez engaged in statutorily protected activity.

    Plaintiff contends that Defendants took an adverse action against him by terminating him.

Termination is obviously an adverse employment action, and this element of the prima facie case

is easily satisfied.

    Finally, Defendants argue that Plaintiff can not establish a causal connection between his

───────────────

    [19] The cases cited by Defendants are distinguishable.  In those cases, the plaintiffs had
alleged only a general relationship with disabled individuals, while in this case, Lopez can name
specific instances in which his advocacy for minority individuals drew derogatory comments
from Vojta, such as his advocacy on behalf of Andrae Boyle.  See Katrina Aff. Ex. 32.

statutorily protected activity and his discharge because Lopez was fired for political insubordination, not for pursuing meritless grievances.  Plaintiff responds that causation can be inferred from circumstantial evidence.  Causation can be inferred from both the close temporal connection between Lopez's termination and his report at a general membership meeting that he had spent a great deal of time dealing with race issues among members, and the conflicting and changing reasons given by Vojta to explain Lopez's termination.

Close temporal proximity between statutorily protected conduct and discharge, without any other circumstantial evidence, fails to raise a material fact regarding causation.  See Pope v. ESA Servs., Inc., 406 F.3d 1001, 1010 (8th Cir. 2005).  In this case, Lopez has presented evidence of proximity in time between the general membership meeting in which he announced his work on behalf of minority members and his termination.  Other evidence, when viewed in the totality of the circumstances, that could establish causation, includes Vojta's derogatory name-calling behind Lopez's back and statements by Vojta that Lopez spent too much time representing minorities.  While this line of evidence may ultimately prove unconnected to Lopez's termination, Lopez has satisfied the minimal burden required of him to state a prima facie case of retaliation.

### 2.    Legitimate, Non-Discriminatory Reasons

With regard to Lopez's discrimination claims, Defendants allege that Lopez was terminated for anti-slate activity, not for his representation of minorities.  Lopez's alleged anti-slate political activity is a legitimate, non-discriminatory reason for discharge.

### 3.    Pretext

Defendants further argue that Lopez can not show that the stated legitimate reason for

Lopez's termination—Lopez's "anti-slate politics"—is mere pretext.  At this stage of the burden

shifting analysis as well as the prima facie stage, mere temporal proximity between statutorily

protected activity and an adverse employment action, standing alone, may not be sufficient to

demonstrate pretext.  Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1114

(8th Cir. 2001); Vosdingh v. Qwest Dex, Inc., 2005 WL 1323007 at *3 (D. Minn. June 2, 2005).

However, after considering Lopez's circumstantial evidence, and giving the evidence the

required favorable inference to Lopez, the Court finds that Lopez has alleged sufficient evidence

to create a genuine issue of fact for trial.  The voluminous deposition transcripts and exhibits

establish that Vojta asserted "political subterfuge" as at least one of his reasons for terminating

Lopez from the time Lopez was first discharged up through the present litigation.  However, at

various junctures, Vojta also asserted other reasons, such as Lopez's insubordination,

countermanding Vojta's order, threatening secretaries, and spending too much time representing

minorities.  While Lopez may ultimately fail to prove he was terminated based on discrimination

rather than "anti-slate politics," Lopez has alleged sufficient evidence to survive summary

judgment.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendants' Amended Motion for Summary Judgment [Docket No.

52] is **DENIED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  January 13, 2006.